Richardson, J.,
delivered the opinion of the court:
These two cases were tried together, and are substantially alike in the material facts upon which the rights and liabilities of the parties must be determined.
In Loper’s case, the claimant let to the defendants, through the War Department, for the term of six months, at an agreed compensation of $300 a day, the steamer General Meigs, owned by him, by a charter-party, wherein it was agreed, among other things, that “the War Department has the privilege to purchase said steamer at the end of three months for the sum of forty-five thousand dollars cash.”
The charter-party recites that it was “made and concluded on this fifteenth day of October, 1802,” and signed and sealed “on the twentieth day of October, 1802,” and contains this provision: “The charter of the above to commence when she is reported at the quartermaster’s office at Philadelphia as being ready to receive cargo.” The steamer was reported for service December 29,1802. At the trial, the claimant’s counsel contended that the right of the War Department to purchase the steamer did not accrue until after March 29, 1863, three months from the date of her reportmgjfor service, while, on the part of the defendants, it was contended that the right accrued on the 15th of January, 1863, three months from the date of the charter.
According to our view of the case, this point becomes wholly immaterial. The defendants’ present position thereon was taken and asserted by the War Department as early as February 2, 1863, and seems to have been acquiesced in by the claimant without objection during the whole period of time in which the transaction set forth in the findings occurred, and until after the final settlement and payment by the defendants in accordance with subsequent agreements, made upon the basis of that construction; and if the claimant would not have been bound by a conceded interpretation not finally acted upon, he is certainly bound by his own agreements, entered into and executed voluntarily, with a full knowledge of all the facts, and without fraud on the part of the defendants’ officers, even if made under a wrong inq>ression on his part as to some of his legal rights by the previous contract. (Stone v. Clark, 1 Metc., 381; Stokes v. Peeknagle, 38 N. Y. Superior Ct., 384; Chicago v. Sheldon, 9 Wall., 54.)
*281 Tbe claimant bas been paid for tbe use of tbe steamer np to tbe 15tb of January, 1803, at tbe agreed rate of $300 per day, and now brings tbis action for ber use from that date until May 13, following, when tbe bill of sale was delivered and payment of tbe purebase-money ($45,000) was made; tbe steamer having been in tbe mean time in use by tbe War Department. If tbe findings disclosed no other agreements than those set forth in tbe charter-party, there would seem tobe no substantial defense to tbe claim; but these additional facts appear:
On tbe 3d of February, 1863, tbe Quartermaster-General addressed a letter to bis assistant in Philadelphia, in tbe following terms:
“ It is understood that the charter-parties of tbe steamers General Burnside and General Meigs, of tbe 15th of October last, provide that tbe War Department shall have tbe privilege to purchase said steamers at the end of three months from that date, for tbe sum of forty-five thousand ($45,000) each. The Q. Master-General'deems it advisable to avail himself of that privilege, and you are accordingly directed to purchase said vessels, as provided in tbe charter-parties, tbe purchase to date from tbe 15th January, 1863. As tbe vessels are still in service, and tbe payments for the service under those charters will not be made beyond that date, tbe owners will be paid tbe expenses of running them from said 15th day of January until such time as tbe expenses are assumed and provided for by tbe United States. It is believed that tbe arrangement now understood to exist between tbe owners of these steamers and tbe captains, whereby tbe latter are to provide tbe necessary officers(except engineers) and crew to man them for tbe sum of one thousand ($1,000) dollars per month, which includes provisions for all of tbe officers and crew, will be advantageous to tbe government; and jrou are therefore authorized to make similar arrangements.”
It was not proved that tbis letter was shown to tbe claimant, nor does it appear positively that its contents were communicated to him, ffiit be was immediately called upon “to make a transfer of tbe vessels to tbe Government, as required by tbe charter-party, to which be replied that be would do it;” and two days afterward, February 4, 1863, be wrote a letter, in which be sets forth bis agreement to sell tbe vessels on substantially tbe terms specified by tbe Quartermaster-General, as follows:
“I would hereby respectfully inform you that I have'sold tbe steam-propellers Geni. Meigs and Gen. Burnside to tbe D. S. War Department, to date from tbe fifteenth of January last past; that tbe U. S. War Department pay all expenses from and after that date.
*282 “It was also agreed that the captains should have one thousand dollars per month to man the boats and victual all hands; the U. S. 'War Department to pay engineers, firemen, & coal-passers’ wages; captain to furnish board.”
A bill of sale was thereupon drawn and signed by Loper, bearing date January 15,1863, and acknowledged on the 23d of February then next following.
Thus it seems to be clearly established that an agreement was made and well understood on both sides for the sale and purchase of the steamer, to date or take effect from the 15th of January.
Then followed some delay and objections by each party. About the 9th of March Loper positively declined to transfer the vessels, and about the same time, on account of the report of a committee of Congress on charters of vessels, the Quartermaster-General gave orders that “none of the purchases will be concluded by payment of the money until the vessels are thoroughly examined and found to be worth the money asked,” adding that the General Burnside and General Meigs had not yet been examined.
Thus the matter stood suspended, neither party insisting upon performance, for two months, until May 9,1863, when the Quartermaster-General gave directions to his assistant in writing to take immediate measures to cany out the instructions embraced in the letter to him dated February 2,1863, “payments for the service of these vessels to cease the 15th of January, 1863, expenses for running them from that date to be paid by owners.”
Thereupon Loper was “told that the Government insisted upon having him transfer the vessels immediately. He protested against the great injustice that the Government was doing, on the ground that vessel property had in the mean time increased from fifty to one hundred per cent, in value, and the Government still owed him for services rendered by these vessels from the 15th January, 1863, up to that date, which he would insist on collecting from the Government; and he would not have made the transfer at all, except that he was powerless to fight the Government; that they had already large sums locked up and suspended, and that he was very much in want of money.”
Yet, notwithstanding these objections, the claimant subsequently made a settlement on the basis of the agreement of the previous February, which had been suspended. On the 13th *283 of May, 1863, be delivered tbe bill of sale wbicb bad been signed in February and bore date January 15,1863. At tbe same time be gave a receipt and voucher for tbe purcbase-money, $45,000, also dated January 15, and setting forth that tbe sale was made “ as per letters dated Quatermaster-General’s Office, 2d and 9th of February, 1863, hereto annexed”; although those letters were not then annexed. He was furthermore paid $4,000, for which he gave two vouchers and receipts for $2,000 each, in which payment is acknowledged “for reimbursement of moneys paid for victualing, manning, and sailing steam-propeller General Meigs for January 15, * * * as per agreement made with Brig. Gen. M. C. Meigs, Quartermaster-General, United States Army.” He also then and on the 17th of June following gave ten vouchers, part at each date, for payment by the defendants of the services of engineers, firemen, and coal-passers, from January 15 to May 15. And on the 12th of June he was paid for the services of the vessel, at $300 a day, up to January 15, and gave his receipt therefor.
Thus it will be seen that the agreement recited by the claimant in his letter of February 4 to have been made by him with the Quartermaster-General, and which that officer proposed in his letter of two days’ earlier date, was fully carried out and executed exactly according to the terms stated by both parties. The sale was declared to have taken effect as of January 15; the claimant was paid the per diem up to that time and the cost of maiming and victualing the vessels thereafter at $1,000 per month, and also for the wages of the engineers, firemen, and coal-passers; all of which was entirely inconsistent with his present claim for per diem compensation after the 15th of January.
Several questions of law were argued at the trial not deemed by us to be involved in the case. The only question to be determined is whether the claimant is bound by his settlements made upon the basis of his agreements entered into subsequently to .the execution of the charter-party, or can set them aside and recover on the first contract, giving credit thereon for the payments made to him upon the basis of the subsequent agreements ; and we are all of opinion that he must be held to his settlements.
When parties make several contracts on the same matter, of different dates, and inconsistent with each other, and act upon *284 them as in this case, tbe latest must control tlieir respective rights and liability as far as it goes, as a later statute repeals all former acts inconsistent therewith; and neither party is left to his choice between them without the consent of the other.
In Reybold’s Case, the vessel chartered was the - General Burnside, owned by four parties, in quarter shares, of whom the captain was one and Loper was another, and he was the managing owner who signed the charter-party. All the owners-joined in the receipt and voucher for the purchase-money, and they executed two bills of sale for different shares, one of them signed by the captain as owner of one-quarter, dated April 29,, 1863, and the other by all the remaining owners, dated January 15,1863.
The receipts for the services up to January 15, for the manning and victualing of the vessels, and the cost of the wages of the engineers, firemen, and coal-passers, subsequently, the latter to the number of fourteen, were signed by said Loper, and contained the same recitals as those in his own case, and his authority to receive the money for the owners is admitted. The-master, who was one of the owners, also certified to the correct-, ness of the two vouchers of $2,000 each for payment for manning and victualing the vessel from January 15. In other respects the cases are generally alike.
The judgment of the court is that the petition in each case be dismissed.